2024 IL App (2d) 230183-U
No. 2-23-0183
Order filed February 20, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF STEVEN P. ANDERSON, Deceased | ) ) ) ) ) | Appeal from the Circuit Court of Lake County.<br><br>No. 22-PR-487 |
| (William E. Anderson Jr., Administrator, Petitioner-Appellant, v. Patrica J. Curnow, Respondent-Appellee). | ) ) ) ) | Honorable Patricia S. Fix, Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court erred in awarding decedent's checking account to his former wife as surviving joint tenant, where the parties' marital settlement agreement severed the joint tenancy. Reversed and remanded.

¶ 2    William E. Anderson Jr., as administrator of the estate of Steven P. Anderson, deceased, appeals the denial and dismissal with prejudice of its petition for citation to recover assets regarding Steven's checking account, which was titled as a joint tenancy account between Steven and his former wife Patricia (Patty) J. Curnow. For the following reasons we reverse the judgment of the trial court and remand for entry of judgment consistent with this order.

¶ 3                                    I. BACKGROUND

¶ 4    Steven and Patty were married in 1998 and divorced on January 19, 2010. The marital estate included a joint tenancy checking account with Inland Bank. Following the divorce Steven continued using the Inland account as his primary bank account. Steven died intestate on July 30, 2022.

¶ 5    On November 23, 2022, the estate filed an emergency motion to freeze the Inland account and a petition for citation to recover assets held in the account against Patty and the bank On November 28, 2022, the trial court entered an order freezing the Inland account.

¶ 6    On February 27, 2023, the estate filed a motion for summary judgment on its petition for citation to discover assets.

¶ 7    On April 13, 2023, following a hearing, the trial court denied the estate's motion for summary judgment.

¶ 8    The matter proceeded to trial on May 11, 2023. Regarding the evidence presented at trial, the parties have submitted an agreed statement of facts pursuant to Illinois Supreme Court Rule 323(d) (eff. July 1, 2017).  The statement reads as follows:

> "The parties stipulated to the admissibility of all proffered bank statements for the checking account.
>
> William E. Anderson, Jr. ('William'), Steven's brother and the Administrator of his estate, testified for the estate and was cross-examined by Patty's counsel. All of Petitioner's admitted Exhibits were admitted during William' s testimony.
>
> William testified and was cross-examined by counsel for Patty. William testified that:
>
> (a) Steven paid Patty $25,000 on January 14, 2010, via check number 3628.

(b) On January 19, 2010, the date of their divorce, the balance in the checking account was $2,111.67.

(c) On March 10, 2010, Steven changed the beneficiary of his retirement account from Patty to William.

(d) In the twelve years between their divorce and Steven's death, Patty never deposited to the checking account, never withdrew from it, never wrote checks on the account

(e) Check number 3850 from the checking account was printed with the names 'Steven P. Anderson' and 'Patty J. Anderson.' Check number 3852 was printed with the name 'Steven P. Anderson.'

(f) Steven was frugal and did not like to waste things he had paid for; it was his habit to completely deplete a supply of something before purchasing replacements.

(g) Bank statements for the checking account were addressed to 'Steven P. Anderson' and 'Patty J. Anderson' at 349 S. Old Rand Road, Lake Zurich, Illinois.

(h) After Steven's death, William searched Steven's residence and found no evidence of any other bank accounts other than the checking account.

(i) William's search of the residence did not yield any letters or similar documents showing that Steven wanted to 'leave money or property' to anyone.

(j) Steven's paychecks from his employment were directly deposited into the checking account.

(k) Steven used the checking account to pay his mortgage and day-to-day living expenses; the checking account was Steven's only bank account.

(l) No one except Steven signed any checks from the checking account after January 19, 2010, the day of his divorce from Patty.

(m) Steven never told William that he intended to leave any money to Patty.

(n) Steven was not terminally ill and he was not expected to die at the time of his death; his death was an accident.

(o) Steven was laid off from his job in March, 2022, and was not actively seeking employment at the time of his death; the funds in the checking account were the funds he used to pay his mortgage and bills in the months between his layoff and death.

(p) On March 15, 2010, the checking account received a direct deposit tax refund from the State of Illinois for $236.00. On March 26, 2010, the checking account received a direct deposit tax refund from the federal government for $6,764.97. On March 29, 2010, Steven wrote a check to Patty for $3,500 and marked the memo line 'TAX RETURN.'

Mary Gearhart, Patty's sister (hereinafter 'Mary'), testified and was cross-examined by counsel for the Estate. Mary testified that:

(a) Mary resided with Patty for just over two years, from May, 2019 to July, 2021.

(b) While Mary was living with Patty, Mary observed Steven and Patty's relationship during Steven's visits, which occurred approximately weekly during the time period that Mary lived with Patty.

(c) Mary testified that Steven and Patty's relationship was amicable.

(d) Mary and Steven were both smokers, so they went into the garage at

Mary's residence to smoke. On that occasion, which was in October or November of 2019, Steven told Mary that he still loved Patty and that he would like to take care of Patty and her two adult daughters.

Patty testified and was cross-examined by counsel for the Estate. Patty testified that:

(a) Steven was an alcoholic and that was the cause of the divorce.

(b) She and Steven saw each other 'on and off' after the divorce, and that they saw each other 'every Saturday unless we both had other plans.' They also traveled together.

(c) Patty and Steven traveled to Mexico together to celebrate Patty's 60th birthday. During that trip, Patty testified that Steven told her he would leave her money when he died. Patty testified that Steven drank alcohol during the trip.

(d) The checking account was never divided at the time of divorce.

(e) During the prove-up hearing at the time of dissolution, Patty testified that Steven paid her $25,000 for her interest in all marital property including the marital residence.

(f) Patty had not resided at 349 S. Old Rand Road, Lake Zurich, Illinois, since 2010.

(g) At the prove-up hearing at the time of divorce, Patty testified that the parties intended to file joint 2009 income taxes and that they would split the tax refund.

(h) Patty and Steven did not see each other for at least six months prior to his death.

(i) Patty and Steven did not see each other for the last few months prior to his death but they never stopped communication and texted almost every day. She believed he was depressed and drinking heavily during that time.

(j) Patty did not reach out to Steven's family to express concern about Steven's mental or physical health during the last year of his life."

¶ 9 Among the exhibits admitted at trial were, Steven and Patty's divorce decree, and a report of proceedings from the final prove up hearing on January 19, 2010. In pertinent part, the marital settlement agreement stated that:

"The parties hereto consider it in their best interests to settle between themselves now and forever the matter of maintenance and to fully settle rights of property of the parties, other rights growing out of the marital or any other relationship now or previously exiting between them and to settle any and all rights of every kind, nature and description wherein either of them now has or may hereafter have or claim to have against the other, or in or to any property of the other, whether real, personal or mixed, now owned or which may hereafter be acquired by either of them, or any rights or claim in and to the estates of the other.

* * *

1. The parties have agreed to split or have split the joint checking, savings accounts and personal property.

2. The parties own a marital residence located at 349 S. Old Rand Road, Lake Zurich, Illinois. Steven has refinanced the residence and has paid to Patty the sum of $25,000 as and for her interest in all marital property."

¶ 10    At the prove up hearing Patty testified that Steven had paid her $25,000 for her "interest in all the marital property including the home[.]" The exhibits also included check number 3628 from the Inland account, dated January 14, 2010, and made out to Patty in the amount of $25,000. A bank statement from the Inland account dated February 10, 2010, included all transactions from January 8, 2010, through February 10, 2010, including the check for $25,000.

¶ 11    Also admitted were checks numbered 3850 and 3852 from the Inland account. Each was posted January 24, 2012. Check number 3850 bore both Steven and Patty's names, while check number 3852 included only Steven's name. A statement dated April 9, 2010, showed that State and Federal tax refunds were deposited into the Inland account on March 15, 2010, in the amount of $236, and on March 26, 2010, in the amount of $6764.97 respectively. It also showed that on March 31, 2010, Steven wrote a check to Patty in the amount of $3500, slightly less than one half of the total tax refund.

¶ 12    A designation of beneficiary form dated March 8, 2010, from Aviall, Inc., was admitted into evidence, in which Steven designated his brother William as the primary beneficiary of the policy, and his sister, Janine Kierzyk, as the contingent beneficiary.

¶ 13    Several more recent bank statements from the Inland account were also admitted as exhibits. These statements were dated December 31, 2021; January 31, 2022; February 28, 2022; March 31, 2022; April 29, 2022; May 31, 2022; and August 31, 2022. On the first page of each statement in the upper right corner was the statement date, Steven's name, and the account number. This information also appeared at the top of each subsequent page. However, the mailing address portion of the statement, which would be visible through a windowed mailing envelope, included both Steven and Patty's names.

¶ 14    Finally, several text messages between Patty and Steven dated June 5, 2022, through July 22, 2022, were admitted into evidence. The conversations pertained to Patty's family, and Steven's search for new employment and insurance. The general tone of the conversations was amicable.

¶ 15    Following the trial, the trial court entered judgment denying the petition for citation to recover assets, dismissing it with prejudice. The agreed statement of facts states that the trial court made the following findings on the record:

"Judge Fix, citing *In re Estate of Blom*, 234 Ill.App.3d 517 (2nd Dist. 1992), and the 'unrebutted fact' that the checking account was titled in the names of both Steven and Patty, found:

(a) In Illinois, if an asset is jointly titled, there is a presumption that the deceased joint tenant had donative intent vis-à-vis the surviving joint tenant;

(b) That presumption can be rebutted by clear and convincing evidence, a standard not as high as 'beyond a reasonable doubt' (which Judge Fix characterized as 99% certainty), but higher than 'preponderance of the evidence' (which Judge Fix characterized as approximately 55% certainty). Judge Fix characterized 'clear and convincing' standard as approximating 55% - 99% certainty;

(c) the checking account remained titled in the names of both parties;

(d) Petitioner presented 'some' detailed evidence of lack of donative intent namely the marital settlement agreement, transcript of the divorce prove-up hearing, texts between the parties, the change of beneficiary designation form, and checks 3850 and 3852;

(e) However, Steven continued to get bank statements for years with Patty's name on them after the divorce and, therefore, the Estate did not overcome the

presumption of donative intent;

(f) the Petitioner did not present clear and convincing evidence that Steven did not intend to make a gift to Patty;

(g) Steven received more than 140 bank statements showing the name of both parties on the account;

(f) The testimony of all witnesses was candid and truthful;

(g) there was testimony that Steven said he wanted to leave something to Patty;

(j) evidence of a continued relationship between Steven and Patty eclipsed the divorce. This is not a situation where Steven never contacted Patty after the divorce. Instead, the parties kept in touch;

(k) the Citation to Recover Assets is denied."

¶ 16    The estate timely appealed.

¶ 17                                    II. ANALYSIS

¶ 18    On appeal the estate argues that the trial court erred in awarding Patty the Inland account. The estate contends that the marital settlement agreement shows that the parties intended to sever joint ownership in all property including the Inland account, that the marital settlement agreement destroyed the four unities required for a joint tenancy, and that the trial court improperly applied the principles of donative intent. The estate alternatively argues that the trial court erred in awarding Patty the entirety of the Inland account, as she was entitled only to her tenant-in-common share of the marital assets held in the bank account, not the non-marital assets contributed by Steven following their divorce.

¶ 19    The estate asks us to consider whether the marital settlement agreement severed the joint

tenancy, which existed in the Inland account during the marriage. "A marital settlement agreement is construed in the manner of any other contract, and the court must ascertain the parties' intent from the language of the agreement." *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009). The construction of a clear and unambiguous contract presents a question of law which we review *de novo*. *Ritacca Laser Center v. Brydges*, 2018 IL App (2d) 160989, ¶ 15.

¶ 20    "At the creation of a statutory joint tenancy, a presumption of donative intent arises and a party claiming adversely to the instrument creating the joint account has the burden of proving by clear and convincing evidence that a gift was not intended." *In re Estate of Harms*, 236 Ill. App. 3d 630, 634 (1992).

¶ 21    The Estate does not dispute that the opening of the Inland account created a joint tenancy with right of survivorship between Steven and Patty. Instead the estate argues that the marital settlement agreement severed the joint tenancy which existed in the account.

¶ 22    "A joint tenancy can be severed when one tenant voluntarily or involuntarily destroys one of the four unities (interest, time, title, and possession) that are crucial to the creation and continuance of a joint tenancy." *Gayton v. Kovanda*, 368 Ill. App. 3d 363, 366 (2006). A joint tenancy may also be severed by agreement of the joint tenants, and such an agreement may either be express or implied from the conduct of the parties inconsistent with holding in joint tenancy. *Estate of Dompke v. Dompke*, 186 Ill. App. 3d 930, 935 (1989). "An agreement to sever itself operates to effect a severance, and the intervening death of one of the joint tenants will not defeat the severance even though the agreement is not performed." *Thomas v. Johnson*, 12 Ill. App. 3d 302, 305 (1973).

¶ 23    "The right of survivorship of a joint tenant does not arise out of the marriage relationship." *In re Woodshank's Estate*, 27 Ill. App. 3d 444, 447 (1975). A divorce decree alone does not serve

to sever a joint tenancy. *Matter of Coleman's Estate*, 77 Ill. App. 3d 397, 400 (1979). However, a divorce decree which incorporates an agreement of the parties to sever a joint tenancy will serve to sever a joint tenancy. *Woodshank*, 27 Ill. App. 3d at 449.

¶ 24    The estate maintains that the language of the marital settlement agreement demonstrates an intent to sever the joint tenancy. In support the estate relies on *Estate of Dompke v. Dompke*, 186 Ill. App. 3d 930 (1989). In *Dompke*, the marital property included a brokerage account held in joint tenancy by the former husband and wife. *Id.* at 933. Their divorce decree incorporated a written property settlement agreement which provided that, "husband shall have as his sole property" the stocks and bonds held in the brokerage account. *Id.* at 934. The former husband predeceased the former wife, and she sought possession of the stocks and bonds on the basis that title vested in her as surviving joint tenant. *Id.* at 936. The court rejected this argument, finding that the property settlement agreement manifested an intent on the part of the former spouses to sever the joint tenancy. *Id.*

¶ 25    Patty argues that *Dompke* is distinguishable from the instant case because the agreement in *Dompke* expressly assigned the stocks and bonds to the former husband as his sole property, whereas the language of the marital settlement agreement in the instant case did not expressly assign the Inland account to either party. While we agree that the language of the settlement agreement did not expressly assign the Inland account to Steven or Patty, such language was not necessary to effectuate the severance of the joint tenancy. As the *Dompke* court stated, "In the case at bar, we find that the parties expressly agreed to *even more* than the mere severance of the joint tenancy in the securities." (Emphasis added.) *Id.* at 935. The severance of a joint tenancy may be accomplished without reassigning interest to either party. See *Thomas*, 12 Ill. App. 3d at 305 (agreement to sell marital home severed joint tenancy); see also *In re Marriage of Dowty*, 146 Ill.

App. 3d 675, 680 (1986) (same).

¶ 26    Patty additionally argues that because the language of the marital settlement agreement left open the issue of splitting the Inland account for a future date, and that because Steven and Patty never divided the Inland account, the joint tenancy continued. We disagree with Patty's contention. The agreement states that Steven and Patty "have agreed to split or have split" the Inland account, indicating that the parties had either split the account or agreed to do so in the future. The fact that Steven paid Patty $25,000 from the Inland account, retained the remaining approximately $2000 for his own purposes, and Patty made no claim towards any monies in the account for 12 years shows that the Inland account was indeed split and the joint tenancy severed. Further, even had the account not been split, what matters for determining whether the joint tenancy was severed is whether the parties agreed to sever the joint tenancy, not whether they actually took the formal steps to effectuate the severance. *Dowty*, 146 Ill. App. 3d at 679 (intention to partition was sufficient to destroy the unity of joint tenancy); *Thomas*, 12 Ill. App. 3d at 306 ("[T]he performance of the agreement to sever the joint tenancy prior to the death of [husband] was not necessary to effect the severance."). The parties' agreement to split the Inland account demonstrated a clear intent to sever their joint tenancy in the account.

¶ 27    Patty seeks to distinguish the instant case from *Dowty* on the basis that the marital settlement agreement in *Dowty* contained language indicating that the parties had settled all property rights. *Dowty*, 146 Ill. App. 3d at 677 ("That all other property rights of the parties have been settled by and between the parties and none have been left unsettled."). Unfortunately for Patty, this language applied to everything other than the sale of the marital residence, which was the central issue in *Dowty*, and therefore was not dispositive of the matter. Further, the marital settlement agreement in the instant case contains even stronger and more encompassing language

regarding the parties' intention to resolve all matters between them than that in *Dowty*.

¶ 28    Finally, Patty points to Steven's post-dissolution conduct as evidence that Steven did not intend to sever the joint tenancy. We do not find this argument persuasive. The clear and plain language of the marital settlement agreement demonstrates that Steven and Patty intended to sever their joint tenancy in the Inland account. Steven's post-dissolution conduct would be relevant only to show that a new joint tenancy had been created. See *Dompke*, 186 Ill. App. 3d at 936 (following severance of joint tenancy via agreement of parties, former wife would need to show creation of new joint tenancy to claim ownership of brokerage account). Patty does not argue this, nor do the facts support such a finding.

¶ 29    Having determined that the marital settlement agreement severed the joint tenancy, we need not address Steven's argument that Patty would be entitled to only her share of the undivided marital property held in the Inland account, because Patty's claim to the Inland account would stem from her alleged joint tenant relationship.

¶ 30                                  III. CONCLUSION

¶ 31    For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand the matter for entry of judgement on the estate's petition for citation to recover assets in favor of the estate.

¶ 32    Reversed and remanded.